SAMUEL T. EVANS, Appellee, *vs.* ERNEST H. MOORE *et al.* Appellants.

*Opinion filed October 28, 1910—Rehearing denied Dec. 9, 1910.*

1. TRUSTS—*what does not raise a resulting trust.* A mere parol promise of a grantee or devisee to hold the title of the property in trust, unattended by any fraud in procuring the conveyance or devise, does not raise a resulting trust.

2. SAME—*when owner of property becomes trustee for another.* Where the owner of property agrees, in writing, to devise property to another if the latter will do certain things constituting a valuable consideration, and the promisee accepts the offer and does the things agreed upon, the promisor becomes a trustee of the legal title for the promisee.

3. CONTRACTS—*when agreement to devise land is based upon valuable consideration.* An agreement by a land owner to devise his property to his nephew if the latter will leave his parents and relatives, renounce allegiance to his country and come to the United States to live and become a citizen thereof is founded upon valuable consideration, and upon performance of the conditions the nephew is entitled to have the agreement carried out as against a subsequent voluntary grantee or devisee of the promisor, there being no question of the rights of *bona fide* purchasers involved.

4. LACHES—*equity not bound by limitations applicable to actions at law.* In suits where the jurisdiction of equity is exclusive the court is not bound by the limitations applicable to actions at law, but may restrict or enlarge them according to the circumstances of the particular case.

5. SAME—*when complainant is not barred by laches.* One who, by having fully complied with the terms of his uncle's proposal to devise property to him, is entitled to such property at the time it is devised to a third person upon the latter's verbal promise to hold the title in trust for the nephew, and who by the declarations and actions of such third person is induced to believe that the latter

will make the conveyance without resort to the courts, is not barred from asserting his rights against the devisees of such person after the latter's death, there being nothing which renders the enforcement of his rights inequitable.

APPEAL from the Circuit Court of Lee county; the Hon. OSCAR E. HEARD, Judge, presiding.

This is a bill in equity by appellee, Samuel T. Evans, as complainant, against appellants, who are executors, heirs and devisees of John H. Moore, deceased, to require them to account for, convey and assign to complainant certain real estate in the city of Dixon, Illinois, and certain personal property which in his lifetime belonged to David L. Evans, uncle of complainant, and was by said David L. Evans devised by last will and testament to John H. Moore, deceased, who left a last will and testament devising the same property to his children.

David L. Evans was originally from Wales but had resided in the city of Dixon, Illinois, many years before his death. He had been married but his wife had been dead a long time and they had no children. His only living relatives were a brother, two sisters and nephews and nieces, all of whom resided in Wales and were citizens of Great Britain. The bill alleges that in the latter part of 1891 and the early part of 1892 David L. Evans was in ill-health and believed he had but a short time to live; that he wrote to complainant, asking him to come to Dixon as soon as possible and become a citizen of this country, and, in consideration of his doing so, stated he would leave to complainant all his property. At the time these letters were written the complainant was twenty-five years old, a single man, residing with his parents. The bill alleges that in consideration of the request and promise of David L. Evans the complainant came to Dixon, Illinois, renounced allegiance to Great Britain and became a citizen of this country. The bill alleges that in November, 1894, David L. Evans was

taken seriously ill, and believing it was his last illness he consulted with one Moses C. Weyburn, and being of opinion, on account of complainant's age and unsteady habits, it was not wise to vest him with immediate custody and control of the property, he requested Weyburn to accept title to it and hold it in trust for complainant; that Weyburn declined to accept the trust and secured the consent of John H. Moore to accept the same, and said Moore promised said David L. Evans to accept the trust and hold the property for the benefit of complainant, and agreed that he would turn it over to complainant after his habits became steadier or after he had reached years of greater maturity; that David L. Evans was at that time very ill and confined to his bed and unable to give the matter of the preparation of the will personal attention; that he reposed great confidence in Moore; that Moore was then giving him his personal attention in his illness; that he exercised great influence over said David L. Evans and promised to consult an attorney about having the will prepared; that either through a fraudulent purpose or misunderstanding as to the proper way to carry into effect the expressed intentions of said David L. Evans, said Moore procured the will to be drawn in such manner as to give him the property absolutely and not in trust; that when the will had been so drawn said Moore took it to said David L. Evans, who executed it, but was at the time so weakened by disease and his mental faculties were so dulled that he did not comprehend the manner in which the will was drawn. The bill further alleges that after the will was executed, and before the death of said David L. Evans, said Moore told complainant the property had been given to him (Moore) but that he would turn it over to complainant in a short time; that said David L. Evans died December 6, 1894, three days after making his will, and Moore took possession of the estate and property of the said David L. Evans and took out letters testamentary; that said Moore dealt

out to complainant small sums of money from the proceeds of said estate, and allowed him to occupy rooms in the building and to let rooms to other parties and receive the rent therefor; that on numerous occasions the said Moore professed to be holding the property for complainant, and kept the money of said estate separate from his own private means and kept a separate bank account, as executor; that he never assumed to complainant or to others to hold the property adversely to complainant but acknowledged complainant's rights in the premises, and that complainant never learned anything to the contrary until the death of said Moore, in June, 1907, when it appeared by his will that he had disposed of his property among his children. The bill prays that defendants be ordered and decreed to convey to complainant, by good and sufficient deed, the real estate owned by David L. Evans in his lifetime, and that they be required to account to complainant for the personal property and the rents and profits received by John H. Moore from said real estate.

The answer of defendants denied that any trust relation existed between John H. Moore and the complainant, and denied all the material facts alleged out of which it was claimed in the bill the trust arose, and averred that by the will of David L. Evans, John H. Moore became the absolute owner of all the estate and property of said Evans, and claimed and asserted such ownership from the time of the admission of the will to probate until his death. The answer also set up and claimed the benefit of the Statute of Limitations and the Statute of Frauds, and interposed the defense of *laches* as a bar to any relief.

The cause was referred to the master in chancery to take the proof and report his conclusions. The master reported that the complainant was not entitled to the relief prayed, on the ground that there was an agreement between David L. Evans and Moore by virtue of which Moore held the property for complainant as trustee of a constructive

trust. He found that the agreement of David L. Evans to leave his property to complainant was a valid and binding contract between them; that complainant performed his part of it and that Moore had sufficient knowledge of the agreement to charge him with notice thereof, and that those claiming under him in equity took the property as naked trustees for the benefit of complainant; that the Statute of Frauds, under the circumstances, was not a defense, but that complainant was chargeable with notice of his legal and equitable rights to enforce the trust as early as December, 1894, but failing to take any steps to do so until the commencement of this suit, July 8, 1907, he is barred by *laches* and the Statute of Limitations; that but for *laches* and the Statute of Limitations complainant would be entitled to a decree for the conveyance of the real estate to him and for an accounting for the property and the rents and profits. He reported the defendants were entitled to a decree dismissing complainant's bill. Both parties filed objections, which were overruled by the master and by order of the court stood as exceptions on the hearing. The exceptions filed by defendants were overruled. The exceptions filed by complainant were sustained and a decree entered granting the relief prayed for. From that decree the defendants have prosecuted this appeal.

HENRY S. DIXON, GEORGE C. DIXON, and JOHN B. CRABTREE, for appellants.

TRUSDELL, SMITH & LEECH, for appellee.

Mr. JUSTICE FARMER delivered the opinion of the court:

The bill in this case proceeds upon two theories recognized by both parties in their briefs: (1) That John H. Moore was the trustee of a constructive trust arising out of the facts and circumstances under which he obtained title to the property in controversy; (2) that David L. Evans

made a valid and binding · contract with complainant to leave him his property, and that complainant is entitled to the enforcement of the performance of that contract against the devisees of John H. Moore.

*First*—On the first ground mentioned we do not think the evidence would warrant the relief prayed by complainant. Conceding that the evidence shows Moore promised David L. Evans to hold the property in trust for the benefit of complainant, this alone would not create a trust which could be enforced where the Statute of Frauds was interposed as a defense. A mere parol promise of a grantee or devisee to hold the title to property in trust, unattended with any fraud in procuring the conveyance or devise to be made, does not raise a resulting trust. This question has been so often the subject of decision by this court that it will be unnecessary to do more than to refer to some of the cases. In *Lantry* v. *Lantry,* 51 Ill. 458, will be found a discussion of the question and the citation of numerous authorities. In that case it was said (p. 464) : "It will be observed that in all these cases there is something more than the mere receipt of the title to real estate with a parol promise to hold it subject to a trust. There is an interference with the owner of the property, by means of which he is induced to forego the execution by himself of his designs for the benefit of a third person, and to leave the execution to the party deluding him by a false promise and through such false promise obtaining title to the property. * * * If A voluntarily conveys land to B, the latter having taken no measure to procure the conveyance but accepting it and verbally promising to hold the property in trust for C, the case falls within the statute and chancery will not enforce the parol promise. But if A was intending to convey the land directly to C, and B interposed and advised A not to convey directly to C but to convey to him, promising if A would do so he (B) would hold the land in trust for C, chancery will lend its aid to enforce the

247—5

trust, upon the ground that B obtained the title by fraud and imposition upon A." The rule announced in the *Lantry case* was not new. It was the law as laid down in text books and followed generally by all courts. A few of the many cases decided since the *Lantry case*, where that case was cited with approval, are *Walter* v. *Klock*, 55 Ill. 362; *Fischbeck* v. *Gross*, 112 id. 208; *Biggins* v. *Biggins*, 133 id. 211; *Champlin* v. *Champlin*, 136 id. 309; *Pope* v. *Dapray*, 176 id. 478; *Williams* v. *Williams*, 180 id. 361; *Markham* v. *Katzenstein*, 209 id. 607.

The evidence in this record shows that David L. Evans, at the time he made his will, did not desire or intend then to place the title in complainant. Complainant was to some extent dissipated and his uncle thought it would not be wise to give him the immediate control of the property. For that reason he desired to place the title in someone else for the time being. Moore did not solicit or request that the devise be made to him to hold for the benefit of complainant and did nothing to induce it to be so made, beyond, possibly, promising David L. Evans to hold the title for the benefit of complainant until he was more mature in years and less given to dissipation. It was the intention and desire of Evans to devise the property to Moses C. Weyburn before he ever said anything to Moore about it. Weyburn testified he declined to accept the devise and recommended Evans to make it to Moore, and it was at his suggestion that the devise was so made. We do not think the contention of the complainant that Moore fraudulently prevented David L. Evans from expressing in the will the trust upon which the property was devised is sustained by the evidence. There is no proof that Evans ever said or did anything to indicate that he intended or thought it advisable to express in the will the trust upon which he devised the property. It is true, the will states that all the property should "go to and be the absolute property of the said John H. Moore." The will was written by a law-

yer of high standing in the profession, in the presence of
Moore and Weyburn, and after, as testified to by Weyburn,
he was told by both of them the purpose for which the
devise was made to Moore. Evans was very ill and feeble
in body at the time he executed the will, but according
to the testimony of Weyburn, which is uncontradicted, his
mind was clear enough when he gave directions for the
preparation of the will to fully understand the purpose of
making it and the disposition he desired to make of his
property, and no suggestion was made by him that the trust
be written in the will. Apparently all parties having knowl-
edge of the transaction relied on the verbal promise of
Moore and did not think it necessary to write in the will
the conditions of the devise. If the decree depended alone
upon the enforcement of a constructive trust we are of
opinion it could not be sustained.

*Second*—The proof shows that David L. Evans came
to this country from Wales many years ago and had lived
at Dixon, Illinois, a long time. He was a childless widower
for many years and lived in rooms in the two-story build-
ing on a lot owned by him in the city of Dixon, which con-
stitutes the bulk of his estate. At the time of his death he
owned personal property to the value of $1100. All his
relatives lived in Wales and were citizens of Great Britain.
In the latter part of 1891 he first wrote requesting his
nephew, who was then twenty-four or twenty-five years
old, to come to Dixon, renounce his allegiance to Great
Britain and become a citizen of the United States, prom-
ising if his nephew would do so he would leave him all his
property at his death. Two or three of the letters written
by David L. Evans had been lost, but members of the fam-
ily of complainant, whose depositions were taken in Wales,
testified they read and heard read the lost letters; that in
them David L. Evans urged complainant to come to Dixon
to live, and said if he would do so he would leave com-
plainant all of his property at the time of his death, as he

had no relatives in this country to whom he could·leave it. Three letters written by David L. Evans to his nephew in February, 1892, were introduced in evidence. In one of them the writer states he encloses a ticket from Liverpool to Dixon and $30 in money. In all of them the writer expresses a great desire that complainant come to Dixon and become a citizen of this country as soon as he can, under the law, after arriving. In one or more of them he states he has made his will, and expresses some apprehension about whether he will live until his nephew arrives. He says his will is in the vault of the City National Bank; that John H. Moore and a Mr. Carpenter are executors of it, and advises complainant, if the writer should not survive until he arrives, to confer with Moore and Carpenter, in the hands of one or both of whom would be left all his affairs. He expresses anxiety that complainant shall take out his first papers for naturalization immediately upon his arrival at Dixon, and advises him to take possession of the building at once if he (David L. Evans) should not be alive when complainant arrives. These letters show conclusively that David L. Evans promised complainant, in writing, if he would come to Dixon and become a citizen of the United States the writer would leave him all of his estate and property. The agreement and promise were in writing. Complainant complied with this request and performed the' conditions imposed upon him by David L. Evans.

An agreement, based upon a valuable consideration, to make a particular disposition of property by will will be enforced in equity against those to whom the legal title has descended, and the remedy will not be allowed to be defeated by a devise or conveyance· during the lifetime, inconsistent with the agreement, unless rights of purchasers deserving of protection have intervened; and where specific performance would be decreed between the original parties to the contract it will be decreed as to all who claim under them, unless intervening equities would make the de-

cree an injustice to the parties. (*Whiton* v. *Whiton,* 179
Ill. 32; *Hudnall* v. *Ham,* 183 id. 486; *Oswald* v. *Nehls,*
233 id. 438.) The consideration for the agreement was
that complainant should leave his parents, brothers, sisters
and other relatives, renounce allegiance to the land of his
birth, come to this country to live and become a citizen of
the United States. It was not a case of a promise to make
a gift without consideration, but was an agreement made
upon a legal, valid consideration, and when performed by
complainant the agreement became binding upon David L.
Evans and the law imposed upon him the obligation of
performing it. *Shutt* v. *Missionary Society,* 41 N. J. Eq.
115; *Bush* v. *Whitaker,* 91 N. Y. 616; *Spencer* v. *Spencer,*
25 R. I. 239; 26 Am. & Eng. Ency. of Law, (2d ed.) p. 26.

It is insisted by the defendants that no services were
performed by complainant for David L. Evans and that
the consideration for the agreement was inadequate. The
agreement did not require the performance of any service
by complainant for David L. Evans. There is no evidence
in the record tending to show that David L. Evans contem-
plated or required the performance of any service for his
benefit by complainant as one of the conditions of leaving
complainant his property. David L. Evans appears to have
been engaged in no business at the time the agreement
was made and did not engage in any business before his
death. He lived in rooms in his building, and, when well,
kept his own house and for the most part prepared his own
meals. He seems neither to have required nor desired the
services of anyone else except in case of illness. Upon the
arrival of complainant at Dixon he went to the rooms of
his uncle and resided there for a time until he secured
employment, after which he boarded at other places. When
his uncle was sick he returned to the rooms kept by him and
gave him such attention as he was able to do. There is
some evidence tending to show that occasionally there was
friction between the uncle and nephew, due, probably, to

complainant's drinking. One witness testified he heard complainant on one occasion speak disrespectfully of his uncle, and say he could see him die and tell him he had to die, but there is no other testimony in the record tending to show any lack of respect for or duty toward his uncle by complainant. On the contrary, aside from drinking, there is no evidence, except that of the one witness referred to, that complainant was ever lacking in respect for his uncle, and there is no evidence that he ever failed in the performance of any duty or service requested or desired by his uncle, except in the matter of drinking. The evidence does not show that complainant was badly dissipated, but that he drank intoxicating liquors chiefly when out of employment and occasionally became, to some extent, intoxicated. While this was displeasing to the uncle, it was not a condition imposed by him when he made the agreement to leave his property to complainant that he should abstain from the use of intoxicating liquors, and it clearly appears from the evidence that David L. Evans never intended to deprive complainant of the property absolutely or refused to perform his agreement because of his nephew's habit of drinking, but merely wished to postpone the time when he would come into possession and control of it until his habits had been improved. Nothing complainant did or failed to do relieved David L. Evans of his obligation to perform his agreement. It is a fair inference, we think, from all the evidence, that John H. Moore knew of the agreement, but whether he did or not is unimportant. He paid no consideration for the title to the property, and, whether he had knowledge of the agreement or not, he took it subject to the rights of complainant. Upon the performance of the contract by complainant David L. Evans became trustee for his benefit and Moore took the property subject to the trust, and his devisees took it in like manner. "Wherever property, real or personal, which is already impressed with or subject to a trust of any kind, express or by operation of

law, is conveyed or transferred by the trustees, not in the course of executing and carrying into effect the terms of an express trust, or devolves from a trustee to a third person who is a mere volunteer or is a purchaser with actual or constructive notice of the trust, then the rule is universal that such heir, devisee, successor or other voluntary transferee, or such purchaser with notice, acquires and holds the property subject to the same trust which before existed and becomes himself a trustee for the original beneficiary. Equity impresses the trust upon the property in the hands of the transferee or purchaser, compels him to perform the trust if it be active and to hold the property subject to the trust, and renders him liable to all the remedies which may be proper for enforcing the rights of the beneficiary. It is not necessary that such transferee or purchaser should be guilty of positive fraud or should actually intend a violation of the trust obligation. It is sufficient that he acquires property upon which a trust is, in fact, impressed, and that he is not a *bona fide* purchaser for a valuable consideration and without notice. This universal rule forms the protection and safeguard of the rights of beneficiaries in all kinds of trust. It enables them to follow trust property,— lands, chattels, funds of securities, and even of money,— as long as it can be identified, into the hands of all subsequent holders who are not in the position of *bona fide* purchasers for value and without notice. It furnishes all those distinctively equitable remedies which are so much more efficient in securing the beneficiary's rights than the mere pecuniary recoveries of the law." (Pomeroy's Eq. Jur. sec. 1048.) Therefore, unless the complainant is barred by *laches* or the Statute of Limitations from asserting his rights, we think he is entitled to the enforcement of the agreement of David L. Evans against the devisees of John H. Moore.

While courts of equity usually follow the law in applying the Statute of Limitations, and especially so in cases

where courts of law and equity have concurrent jurisdiction, yet where the jurisdiction of courts of equity is exclusive it is not bound by the limitations applicable to actions at law but may restrict or enlarge them according to the peculiar circumstances of the particular case. "While the limitation fixed by the statute is ordinarily followed as a convenient measure for determining the length of time that ought to operate as a bar, it is not regarded as conclusive or binding. Relief may be refused although the time fixed by the statutory limitation has not expired or may be granted although the time of such limitation has long elapsed. In some cases of purely equitable jurisdiction time may never be a bar." (19 Am. & Eng. Ency. of Law, p. 154.) "The result of this rule of analogy is, that courts of equity, in cases in which their jurisdiction is exclusive, adopt the limitation provided by statute for analogous remedies at law as fixing the period beyond which any delay requires explanation and within which any suit may be brought, unless it affirmatively appears that peculiar facts exist which justify the application of some equitable exception to the ordinary rules. In short, it makes the statute controlling in the absence of proof of special circumstances showing that its strict application would work injustice and wrong. The persuasiveness of the statute acquires the force and effect of absolute law unless the inequity of such an application of the rule is made clearly apparent." (Ibid. pp. 160, 161.) This rule has been repeatedly announced by this court. "The Statute of Limitations is a purely legal as contradistinguished from an equitable defense, and although courts of equity will ordinarily act in obedience and in analogy to the Statute of Limitations, yet they will also, in proper cases, interfere in actions at law to prevent the bar of the statute where it would be inequitable and unjust. (2 Story's Eq. Jur. sec. 1521.) And so it has been held that where the obligation is clear and its essential character has not been affected by the lapse of time, equity will en-

force a claim of long standing as readily as one of recent
origin, as between the immediate parties to the transaction."
(*Thorndike* v. *Thorndike,* 142 Ill. 450.)   In *Reynolds* v.
*Sumner,* 126 Ill. 58, the court said (p. 71) : "Ordinarily,
courts of equity adopt the time fixed by statute for barring
claims at law, in analogous cases, as the period at the end
of which they will conclude recovery in equity.   This rule
is by no means inflexible, and its application will always
depend, upon consideration of the allegations and proof,
whether the presumption from which the bar arises pre-
vails.   The presumption arising from the mere lapse of
time may be repelled by proof of other facts and circum-
stances inconsistent with it.   When possession of trust
property is taken by the trustee under the trust it is the
possession of the *cestui que trust,* whether the trust be ex-
press or implied, and cannot be adverse until the trust is
openly disavowed or denied and this fact is brought home
to the knowledge of the *cestui que trust."*   In *Board of
Supervisors* v. *Winnebago Swamp Drainage Co.* 52 Ill. 299,
it was said (p. 301) : "The fact that the statute is posi-
tive in its terms will not, under all circumstances, operate
as a bar in equity.   There are cases in which a court of
equity will not permit the bar of the statute to be inter-
posed against conscience, and it will supply and administer
a remedy within its jurisdiction and enforce the right for
the prevention of a fraud."   This language was cited with
approval in *Kelly* v. *Donlin,* 70 Ill. 378, and *Farwell* v.
*Great Western Telegraph Co.* 161 id. 522.   Authorities
might be multiplied, but we deem the rule so well estab-
lished as not to require the further citation of cases.

The question then arises, is the rule announced in those
cases applicable to this case?   We think this question must
be answered in the affirmative.   One witness, an old lady,
who was present when the will was executed and signed it
as a witness, testified she heard John H. Moore say to the
complainant immediately after the will was executed, that

it was made; that everything was all right and he would turn the property over to complainant later. A large number of witnesses testified to declarations by Moore, made on different occasions, that he held the property for the benefit of the complainant. To some of them he stated he would turn it over to him when his habits became better, and to one, at least, that he would turn the property over to the complainant when he married. These declarations were made frequently up to within three or four years of Moore's death. While there is no proof of any such declarations or statements during the last three or four years of his life, there is no evidence that he at any time denied holding the property in trust for complainant. In addition to the trust relation sustained by him to the complainant, Moore manifested friendship for and a deep interest in the welfare of complainant. He was anxious that complainant should become a christian and join the Baptist church of which Moore was a member. He solicited him to attend church and Sunday school and wrote him about his spiritual welfare. Complainant did finally join the church, and the friendly relations between him and Moore appear never to have been disturbed. While Moore retained possession and control of the property, so far as the record shows he never claimed it as his absolute property, and, under the relations existing between him and complainant and the purpose for which he claimed the control of the property, we do not think it can be said that Moore's possession was adverse to complainant. He allowed complainant to keep rooms in the building for a time without the payment of rent. He also allowed complainant to collect rent for rooms occupied by others for a while. At one time he gave complainant $50 in money to enable him to buy a bicycle. His conduct and declarations were such as to lull complainant into a feeling of security and cause him to believe that Moore would do precisely as he said he would do and that there was no necessity for any resort

to the courts to secure his rights. Moore kept the account of the estate and property of David L. Evans in his name as executor and separate and apart from his private account. While he stated in his final report, in June, 1903, that as executor of the David L. Evans estate he had taken possession of the property as owner in fee and that no one else was interested in it, there is no proof that complainant had any actual knowledge of this report; and even if he had, under the fiduciary relations existing between him and Moore and the trust and confidence reposed in Moore by him, we do not think this act, alone, sufficient to charge complainant with notice that Moore claimed adversely to him. The proof justifies the conclusion that complainant refrained from asserting his rights by reason of the assurances and conduct of Moore, and it would be inequitable and unconscionable to permit Moore, or the devisees who represent him, to reap the benefit of his own wrong by sustaining the Statute of Limitations as a defense. The delay of complainant in asserting his rights worked no injury to Moore or his devisees, and they were not induced to do anything, or refrain from doing anything, that would make it inequitable to require them to account to complainant for the property which, in effect, he bought and paid for and his uncle intended him to have, and which Moore and his devisees, entire strangers to the blood of David L. Evans, never paid one cent for.

For the same reasons that equity will not permit the defense of the Statute of Limitations it will not permit *laches* to be interposed as a bar to the relief sought by the complainant.

The decree of the circuit court will be affirmed.

*Decree affirmed.*