Louise Hagen, Appellee, v. Eames MacVeagh, Appellant.

Gen. No. 38,744.

Opinion filed December 30, 1936.

James J. Barbour, of Evanston, for appellant.

Stoffels & Stoffels, of Chicago, for appellee; Herbert R. Stoffels, of counsel.

Mr. Justice Friend delivered the opinion of the court.

Louise Hagen, plaintiff, brought a first class action in the municipal court against Eames MacVeagh, defendant, to recover 10 monthly instalments, aggregating $2,500, alleged to be due under the terms of three written contracts entered into between the parties in 1930 and 1933. Trial was had by the court without a jury, resulting in findings and judgment in favor of plaintiff. This appeal followed.

The controversy arises out of a contract dated January 18, 1930, and two supplemental agreements, one made contemporaneously with the principal contract,

and the other October 16, 1933. By way of defense it is urged that the principal agreement lacked consideration, being on its face a mere promise by defendant to make gift payments of $250 monthly to plaintiff during her lifetime. A summary of the salient facts leading up to the execution of these contracts is essential to a clearer understanding of the issues involved.

In 1905 plaintiff, then 16 years of age and employed in a shop in Chicago, casually met defendant, many years her senior. This acquaintanceship ripened into a close and intimate association, extending over a period of more than 20 years. From 1905 to 1910 defendant entertained her socially, assisted her financially in several of her business ventures, gained her trust and confidence, and finally prevailed upon her to give up her business activities. In December, 1910, on one of her visits to his home on Lake Shore drive, Chicago, there occurred the first intimate relations between the parties, resulting in the birth of a child December 12, 1911. Defendant arranged to have her spend the later months of her pregnancy in a retreat near Aurora, Illinois, where she was unknown and registered under the assumed name of Mrs. Holt. While there defendant wrote to her frequently, sent her all necessary funds, and finally obtained her consent to giving the child out for adoption. Six weeks after her confinement she returned to Chicago and surrendered the child to a doctor, who met her at the station in company with defendant. She has not seen the child since nor received any information as to its whereabouts, other than that it was receiving the proper care and attention.

After she returned to Chicago defendant continued to show her marked attention, he broached the subject of marriage and presented her with a diamond ring. Later he gave her various other articles of jewelry and a miniature of himself as a boy. He assisted her first in improving her general education, through the study

of selected subjects, and later encouraged her to study art. While so doing she resided in an apartment in Chicago, engaged for her by defendant. Here the parties frequently met and spent days and nights together. From 1914 to 1918, at defendant's suggestion and with his financial assistance, she pursued her art studies in New York and Europe. She frequently returned to Chicago, where she met defendant in apartments engaged by him and in the Auditorium Hotel, where they registered as man and wife under an assumed name. While in Chicago plaintiff did not travel in the same society as defendant, but as he stated ''she always had a cultivation and charm that would have graced any circle.''

In 1918 plaintiff went to France, served with the Y. M. C. A. during the World War, and remained in the service until she was mustered out at the end. Upon her return she met defendant in Chicago, where their relations were resumed. From 1919 to 1929, the parties were frequently separated. Plaintiff continued to study art and had progressed to the point where she exhibited her paintings in New York and elsewhere and lectured on the subject in various urban centers. Letters of great length passed between them which, until 1924, indicated mutual affection and esteem.

There is some dispute as to when the intimate relations between the parties ceased. Plaintiff insists that they continued until 1927; defendant fixed the time as 1922. At any rate, beginning in 1924 defendant's letters became somewhat critical. He complained of her expenditures and seemed perturbed because she had not progressed to the point of supporting herself. Plaintiff attributes this change in attitude to the fact that the letters in these later years were edited by defendant's counsel, James J. Barbour.

October 10, 1929, while plaintiff was in New York city, two letters were delivered to her studio by a bell boy from the Pennsylvania hotel, one from defendant

and the other from Mr. Barbour, his attorney. Defendant's letter stated briefly that he was going to Europe and had requested his lifelong friend, Barbour, to discuss certain matters with her. Barbour's communication merely stated that he would call on plaintiff at her studio early the next morning. He called the following day and after making some references to defendant, he apprised her of the fact that MacVeagh had been married two days previously and had left for Europe on his honeymoon. This news was undoubtedly a great shock to plaintiff, because both sides characterize it as such, and Mr. Barbour suggested that she accompany him to his old home town, Norwalk, Conn., in order that she might compose herself, and then to Atlantic city, where discussions could be had free from the interruptions of her friends. They remained in conference at Atlantic city for several days, where the subject matter of the written agreements was discussed. Later Mr. Barbour drafted the first two agreements and submitted them to plaintiff for her signature.

The principal contract between the parties, made January 18, 1930, is quite lengthy, but inasmuch as it forms the basis of this controversy we set it out in full, as follows:

"AGREEMENT made (18th of January, A. D. 1930), (between EAMES MACVEAGH, of the City of Chicago, party of the first part, and LOUISE HAGEN, now and for several years past a resident of the City of New York), WITNESSETH THAT:

"WHEREAS, for many years heretofore and continuously up to the present date, the party of the first part has assisted the party of the second part in pursuing the calling of an artist and has provided for her living expenses continuously, during the period referred to, by monthly allowances and otherwise as her necessities required; and has from time to time heretofore orally agreed to make provision, by means of a trust agree-

ment, for the continuance of monthly payments to the obligee for the period of her natural life; and

"WHEREAS, on consideration of such support and financial aid rendered by the party of the first part to the party of the second part, the said party of the second part has for the better pursuit of her professional calling, lived away from the City of Chicago, and maintained her residence and studio for said several years last past in the City of New York; and

"WHEREAS, it is the desire of the party of the second part to now abandon her studio and residence in the City of New York and the pursuit of her profession in the City of New York for a period of at least one year hereafter and to proceed within the next sixty days to establish her residence in Europe and continue to reside abroad and away from the United States of America at least until March 1, 1931, to still better pursue her art work, and at the same time to reduce her living expenses; and

"WHEREAS, it is further the desire of the party of the first part to provide for the payment of the sum of not less than Three Thousand ($3,000) Dollars per year to the party of the second part so long as she shall live, such provision for support of the party of the second part to be in consideration of the agreements and undertakings moving to the party of the first part and here and now entered into by the party of the second part, including the release by the party of the second part, here and now given, of all claim to a certain promissory note dated May 28, 1915, for Five Thousand ($5,000) Dollars, signed by the party of the first part to the order of the party of the second part, and made payable by its terms two months after the death of the party of the second part, which note has been heretofore held by JAMES J. BARBOUR, for the use and benefit of the party of the second part (which note is accordingly cancelled and destroyed); and in further

consideration of the sum of One ($1.00) Dollar herein now paid by the party of the second part to the party of the first part, and of the acceptance by JAMES J. BARBOUR of the trusteeship herein created; and

"WHEREAS, further, it is the desire of the party of the second part to accept the provisions herein made for her by the party of the first part and in consideration thereof to release and save him harmless from all claims and obligations that may now exist on his part to her;

"Now, THEREFORE, it is agreed that the party of the first part for the considerations aforesaid, shall:

"1. Advance and pay to the party of the second part upon the signing of this agreement, a certain sum of money to be receipted for by her as in full satisfaction and payment of her present outstanding liabilities, said sum of money to be used to the extent that it is necessary in the discharge and payment by the party of the second part of all her outstanding bills.

"2. The party of the first part agrees that beginning on the first day of March, A. D. 1930, and for a period of two years thereafter, he will provide for and cause to be paid to the party of the second part the sum of Three Hundred ($300) Dollars monthly, the same to be provided by way of letter of credit or other bank obligation at the convenience of the parties hereto.

"3. On and after the first day of March, 1932, the party of the first part, his heirs, administrators, executors and assigns, shall pay to the party of the second part the sum of Two Hundred and Fifty ($250) Dollars monthly and on the first of each month, said payment to be made in like manner by letter of credit or other bank obligation as may suit the convenience of the parties hereto.

"4. In consideration of the foregoing agreements made by the party of the first part to the party of the second part and the fulfillment of the same as the pe-

riods of payment shall from time to time mature, and in further consideration of the acceptance by James J. Barbour of the trusts and obligations imposed upon him herein, and by the trust agreement hereinafter referred to, the party of the second part herein now agrees:

"1. To abandon her residence, studio and profession in the City of New York for the period of at least one year after the signing thereof.

"2. Within thirty (30) days after the signing hereof to depart from the United States of America and remain and reside somewhere in Europe until at least March 1, 1931.

"3. To surrender or to account for as a credit on the monthly payments to be made by the party of the first part any sums not yet drawn by the party of the second part on any letter of credit which she may now have which has been provided for her by the party of the first part prior to October 1, 1929.

"4. And in consideration of the promises and agreements of the said party of the first part, the party of the second part does hereby release, satisfy and cancel all claims of her, the party of the second part, both legal and equitable, against him, the party of the first part, by her at any time made or had, of every nature and kind down to and including the present date except, of course, the agreements and undertakings assumed in this instrument by the said party of the first part.

"And the party of the first part and the party of the second part both do further agree, each with the other, that in consideration of the covenants and undertakings herein entered into by each of the parties hereto, that neither of said parties will annoy or molest the other party nor expose him or her to publicity or criticism by reason of any matter or thing incident to or growing out of the association or controversy between the party of the first part and the party of the second

part hereinabove set forth or with reference to the signing and executing of this agreement and release.

"The parties of the first part and the second part do further agree that JAMES J. BARBOUR of the City of Chicago, County of Cook and State of Illinois, shall act as Trustee to see to the carrying out of the agreements herein made by the party of the first part to the party of the second part and to act as a medium of communication between the parties hereto of and concerning all matters arising out of this agreement.

"And the party of the first part doth hereby further agree to deliver to and deposit with the Trustee hereinafter named, a certificate for one hundred (100) shares of the stock of the Continental Illinois Bank and Trust Company of Chicago, made out in the name of the party of the first part and by him endorsed in blank for the purpose of transfer.

"And it is further agreed between the parties hereto including the Trustee, that the said certificate of stock shall be held by the Trustee and by his successor in the event of his death or failure or inability to further act as Trustee, to fully secure the carrying out of the undertaking by the party of the first part with the party of the second part.

"It is further agreed that said certificate shall be held without transfer on the books of the said Continental Illinois Bank and Trust Company to the said trustee or to any other person so long as the party of the first part shall live and fully carry out the terms of this agreement as the obligations set forth herein shall mature and so long as the said party of the first part is not in default he shall receive and retain for his own use, all dividends and rights which shall be issued upon the said certificate for one hundred (100) shares of stock in said bank.

"It is further agreed that upon the death of the party of the first part the said certificate shall be transferred to the said trustee to be held by him as trustee

or by his successor in trust as a further security for the fulfillment of this contract and agreement so long as the party of the second part shall live.

"Upon the failure and default of the party of the first part, his heirs, administrators, executors or assigns, for a period of four months, to carry out any obligation under this agreement of the party of the first part to the party of the second part that has accrued or matured, the trustee shall proceed to make sale of said one hundred (100) shares of stock or so much thereof as may be necessary from time to time to fulfill and discharge any such default and matured obligation.

"Upon the death of the party of the second part, the said certificate for one hundred (100) shares of stock in the said Continental-Illinois Bank and Trust Company shall be delivered to and become the property of the party of the first part in the event he is then alive; otherwise, to his widow in the event she is then alive; otherwise, to the next of kin of the party of the first part.

"It is further agreed that the obligations of the parties hereto, including the said trustee shall be further declared and set forth in a certain trust agreement to be executed contemporaneously with this agreement and the terms of this agreement and undertaking shall stand as a full and valid consideration for the execution of the said trust agreement.

"This agreement shall be binding in all respects upon the heirs, administrators, executors, and assigns of the parties of the first and second part respectively.

"In Witness Whereof, said parties have hereunto set their hands and seals as of the day and year first above written, the party of the first part actually signing and executing this agreement in the City of Chicago, County of Cook and State of Illinois, on the 18th day of January, A. D. 1930, and the party of the second part signing and executing this agreement in the City

of New York and State of New York, on the 20th day of January, A. D. 1930.

"EAMES MACVEAGH (Seal)
LOUISE HAGEN (Seal)

"And now comes JAMES J. BARBOUR, the Trustee named in the foregoing agreement, and accepts the trust imposed upon him and agrees to act as the Trustee for the purposes therein stated, it being understood and agreed that his compensation as Trustee shall be paid in the first instance by the party of the first part, and in default of such payment he shall receive reasonable compensation, expenses and outlays for his acts as such Trustee out of the collateral in his hands, to-wit, the certificate for one hundred (100) shares of the stock of the Continental-Illinois Bank and Trust Company.

"It is further agreed and understood that the Trustee may exercise any additional power that shall be granted to him in that certain trust agreement referred to herein and executed contemporaneously with this agreement.

"SIGNED, SEALED AND DELIVERED, at Chicago, Cook County, Illinois, this 18th day of January, A. D. 1930, by the said JAMES J. BARBOUR, Trustee, and approved by the parties of the first and second part as further signatures below.

"JAMES J. BARBOUR (Seal)
Trustee

"Approved: EAMES MACVEAGH (Seal)
Party of the First Part

Approved: LOUISE HAGEN (Seal)
Party of the Second Part."

The second agreement, entered into contemporaneously with the foregoing contract, merely recited defendant's undertaking in the first agreement to pay out certain sums toward the extinguishment of plaintiff's outstanding liabilities and the monthly payments

to be made to her for the balance of her natural life; that defendant had in the first contract agreed to deposit with James J. Barbour, as trustee, a certificate for 100 shares of the stock of the Continental Illinois Bank & Trust Company of Chicago to secure the fulfillment of the undertakings of that agreement; and it defined the trustee's duties with reference to the stock thus deposited in trust for plaintiff's benefit.

The third contract, dated October 16, 1933, again set forth the agreement of defendant to make monthly payments to plaintiff during her natural life, the deposit of 100 shares of the capital stock of the Continental Illinois Bank & Trust Company to secure these payments, that the stock so deposited had constantly declined in value until it was then worth only about $25 a share, and provided that plaintiff was to receive in lieu of said stock $2,500, which was paid to her, and that the 100 shares of stock were to be released from the operation of the trust. The agreement provided that nothing therein contained was intended to release defendant in anywise or affect the obligations assumed by him under the first contract of January 18, 1930, "but, on the contrary, the intention and meaning thereof is that every obligation assumed by said Eames MacVeagh, party of the second part in said agreement mentioned, are in full force and effect, except the obligation to furnish and maintain in trust 100 shares of Continental Illinois Bank & Trust Company stock as security for said payments, . . ."

Defendant continued to make the payments called for by the contract until February, 1934. Thereafter he took the position that because of his poverty it would no longer be possible for him to continue the payments. No other reason was assigned. Many letters passed between Barbour and plaintiff containing references to defendant's poverty-stricken circumstances, but none of these denied the validity of the

contracts. Suit was finally instituted December 13, 1934, 10 months after the initial default, and judgment was eventually entered for $2,500. It was not until defendant filed his affidavit of defense that plaintiff was apprised of the contention now made, that these agreements are invalid for lack of consideration and that the payments provided for therein were intended and considered by defendant as mere gifts.

As ground for reversal it is first urged that the principal contract of January 18, 1930, "is illegal and void, inasmuch as the obligations assumed by the defendant thereunder were by way of gift only, and without legal consideration." It is argued that the agreement fully sets forth all of plaintiff's claims and that those specified, and from which she intended to release defendant, were the only claims she had; that if she had had a claim for breach of promise of marriage it would have been listed among the others; and that her failure to assert the existence of such a claim indicates that she had none. The gravamen of the argument is that defendant never promised to marry plaintiff. Inferentially it must be conceded that if a valid claim for breach of promise to marry had existed when the contract was made, and had been specifically included among the other claims from which defendant was then being released, it would have constituted a valid consideration for defendant's promise to pay her $250 monthly during her lifetime. This involves a consideration of the principal question of fact in controversy, namely, whether there existed a promise of marriage by defendant. The court was evidently of the opinion that there was such a promise. There is evidence of three or four instances when marriage was discussed. Plaintiff testified that after the child was given out for adoption defendant first broached the subject of marriage and presented her with a diamond ring. They had dinner together, went to the theatre, and plaintiff

stated that defendant said, "it would be so nice if we could be married immediately, but we shall have to wait until some time during the year"; that his father would object to his marriage and his mother had social ambitions for a brilliant marriage by him.

Again, in 1916, after the death of defendant's mother, he told plaintiff "how much he would love to marry her, but was afraid he would have to wait because his father would object so strenuously." Plaintiff further testified that when she returned from Europe after the World War defendant told her "that he wanted so much to marry her, but could not because of the disparity in their positions"; that he could not marry while his father was living. In these various discussions of marriage plaintiff states that in view of the reasons assigned she consented to wait, and if these conversations were had as related by her, in view of defendant's promises to marry after his father's death, there would have been no occasion for her again to refer to the matter so long as the elder MacVeagh was alive. Following his mother's death defendant took plaintiff to the family vault where she assisted him in sorting the family jewels and heirlooms. He left her there, alone, for an hour or two, then returned, and, according to plaintiff, the subject of marriage was again discussed. All of these conversations relating to marriage are denied by defendant, but circumstances lending support to plaintiff's evidence are not and cannot be denied. Defendant from time to time presented her with various of these articles of jewelry and heirlooms and according to his own testimony he "had a great deal of love and affection for her for a long period of time," and the assistance he gave her through all the years, the money that he paid to her, "were not given because of the illicit relations." Defendant's counsel emphasizes the fact that there was no promise of marriage in writing. This may be explained by

plaintiff's testimony that defendant took many of his letters, written to her, and has not returned them. Her testimony in this respect is supported by the fact that one of these letters was produced by defendant at the trial. There is in evidence a letter postmarked April 10, 1923, where defendant wrote:

"Dearest Girl:

Thank you again for your incredibly lovely letter. It makes it clear that we can now quickly have things on a basis most conducive to the happiness of both, and make our precious love and affection more worth while than ever and more imperishable. . . .

"I am so sorry, sweetheart, that you have had that little set back, but I pray that all is smooth sailing again now. . . .

> "Most lovingly and devotedly,
> E"

This is but one of many of the affectionate expressions of defendant, and it is difficult to reconcile the language of this document, wherein defendant holds out hope of making "our precious love and affection more worth while than ever and more imperishable," with the contention that he never promised to marry her.

Moreover, defendant's counsel has insisted all through his brief and the contract of January 18, 1930, is predicated upon the theory that the relationship between the parties was purely platonic; that of patron and protegé. If that were true, and no understanding existed between them other than a business association or friendship, it is difficult to understand why defendant did not personally call on plaintiff in 1929 and advise her of his impending marriage. His aversion to meeting his so-called protegé, the suddenness with which his marriage to another was announced through his attorney on the eve of his departure for Europe, and his and Barbour's apparent eagerness to have her release all claims "by her at any time made or had, of

every nature and kind, down to and including the present date,'' almost contemporaneously with defendant's marriage, including the agreement on her part to depart for Europe and remain away for at least a year, can be attributed only to a desire on defendant's part to be released from some stronger tie between the parties than mere friendship. Plaintiff characterizes it as a troubled conscience and an indication of the desire of defendant to avert what he feared might result in a breach of promise action unless some settlement was made, and we think there is considerable force in the suggestion.

In view of the innumerable letters in evidence expressing defendant's esteem and affection for plaintiff, the tender consideration that he accorded her during almost 20 years, and their deep and mutual friendship and love, as indicated by the affectionate expressions contained in their letters to each other, it is difficult to believe that this relationship could have existed without some expression and discussion of marriage, as plaintiff states. We think the evidence abundantly sustains the contention that there was a promise of marriage and that the underlying purpose of the agreement was to release defendant primarily from what he considered an obligation to consummate a marriage.

It is next urged that the contract is based on an illegal consideration, and defendant places great emphasis on the effect of the decision *In re Greene,* 45 F. (2d) 428. In that case Greene, a married man apparently of large means, had lived in adultery with claimant, Leila Trudel, for several years prior to 1926. After their illicit relations terminated the parties executed an agreement under seal wherein Greene promised to pay claimant $1,000 a month, and she in return executed a general release. Subsequently she sued on the contract alleging that the general release was in fact a release by her of Greene's previous verbal prom-

ise to marry. Greene filed a petition in bankruptcy and his trustees presented the defenses (1) that since past illicit relations were the motive for the promise the contract was illegal, and (2) that there was no consideration for the promise. The court held that the promise in such a case, to be valid, must be supported by some consideration other than past intercourse and that the past illicit relations between the parties did not furnish a consideration for the agreement. It appears that claimant knew Greene to be a married man during all the years that she lived with him, and upon these facts the court commented as follows:

". . . claimant testified that the bankrupt had promised to marry her as soon as he was divorced. Assuming that he did—though he denies it—the illegality of any such promise, made while the bankrupt was still married, is so obvious that no claim could possibly arise from it, and the release of such claim could not possibly be lawful consideration." (p. 430.)

In this respect the two cases are, of course, not at all similar, and what the court said there would, in view of our conclusions here, have no application to the instant proceeding. While it is true that past illicit relations of the parties would not furnish a consideration for the contract, nevertheless such relations do not invalidate the agreement if it be otherwise supported by valuable consideration. Defendant in this proceeding was a single man, and was able to make a valid promise of marriage, as distinguished from the illegal promise attributed to Greene, a married man, known to be such by claimant. The release of a valid promise to marry by MacVeagh, if one existed, would constitute a valuable consideration for the agreement in this proceeding, as would any one of the other considerations recited therein.

Among the other considerations stated was the promise of plaintiff to abandon her residence in the

United States and remain abroad for a period of at least a year. A similar promise was held to be a valid consideration for an agreement in *Evans v. Moore,* 247 Ill. 60, wherein Evans, a resident of Dixon, Illinois, on several occasions wrote to his nephew, the plaintiff, a resident of Wales, that if he would give up his residence and come to Dixon and become a citizen of this country, defendant would will all his property to him. The nephew, in response to his uncle's request, came to Dixon, became a citizen, and in commenting on the validity of the consideration for the agreement, the court said:

"It was not a case of a promise to make a gift without consideration, but was an agreement made upon a legal, valid consideration, and when performed by complainant the agreement became binding upon David L. Evans and the law imposed upon him the obligation of performing it. (*Shutt v. Missionary Society,* 41 N. J. Eq. 115; *Bush v. Whitaker,* 91 N. Y. 616; *Spencer v. Spencer,* 25 R. I. 239.)"

Another consideration recited in the agreement was plaintiff's promise to surrender the balance due on a letter of credit held by her for which defendant was obligated. Defendant's counsel maintains that when the contracts were executed this letter of credit had been exhausted, but he is evidently mistaken, because in one of his letters to plaintiff, he wrote "I cannot recommend the added allowance of the uncollected portion of your letter of credit." This item constituted a money consideration passing from plaintiff to defendant, and would tend to support defendant's promise to pay.

The words of release in this contract are so broad as to include any and every claim that plaintiff had, and might well have included the promise to marry, even though that claim was not specifically enumerated. It is inconceivable that Barbour would, at the behest of the defendant, have spent the time and incurred the

expense required to induce plaintiff to release all her claims "of every kind and nature against defendant," if, as a matter of fact, she had no enforceable claims other than the right to collect a $5,000 note executed by defendant in 1915 and payable to plaintiff after defendant's death, which Barbour insists was legally uncollectible, and the surrender of the balance due on the letter of credit which defendant's counsel maintains had been exhausted when the agreement was made. If the contract be given the interpretation of a pure gratuity, it is difficult to understand why it was made at all. Defendant had been paying plaintiff's expenses during all these years, and if he merely wished to continue making her monthly payments in the nature of gifts, it was not necessary to make any contract. Certainly the promise to pay $250 monthly during plaintiff's lifetime is all out of proportion to any benefit that defendant could have received from a cancellation of the $5,000 note and the surrender of the small balance remaining unused on the letter of credit. The obvious conclusion is that he had in mind a far more important objective, namely, the settlement of a claim which he thought plaintiff had against him and feared that she might assert when she learned of his marriage to another, namely the breach of his promise to marry her.

Mr. Barbour, an able and experienced member of the bar, drew these contracts. On oral argument, in response to the court's question, he asserted that they were prepared in all good faith and in the belief that they were valid and binding legal documents, to be carried out by the parties thereto. We have no reason whatsoever to doubt these statements, and in fact the covenants of these agreements were faithfully performed on both sides for about four years. Plaintiff did all that she was required to do up to the time suit was instituted, and defendant, after acquitting her outstanding obligations, made the monthly payments

stipulated in the agreements until, as Mr. Barbour says, defendant became financially unable to perform, and it was only then and because of defendant's poverty that Mr. Barbour, upon a careful re-examination of the contracts, concluded that they were invalid and void and invoked the defenses here interposed. Plaintiff had no legal advice during the conferences that led up to the preparation of the contracts, because Mr. Barbour had counseled against it, and although she had the documents in her possession for some time before they were signed, she states that she had no legal advice. These considerations lead to the inescapable conclusion that the defense interposed is an afterthought.

Various other points are raised by defendant's counsel, challenging the validity of these agreements, but in view of the conclusions here reached we think it unnecessary to further prolong this opinion by discussing them.

During the pendency of this cause plaintiff made a motion to dismiss the appeal, which was reserved to the hearing. Inasmuch as we have considered and decided the case on its merits, the motion will be denied.

After a careful consideration of all the facts and an examination of the agreements in question, we have reached the conclusion that the contracts are valid and enforceable, and that the court properly held that plaintiff was entitled to recover the sum of $2,500, representing 10 monthly instalments then in default.

The judgment of the municipal court is affirmed.

*Affirmed.*

John J. Sullivan, P. J., and Scanlan, J., concur.